UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CH ROYAL OAK, LLC, d/b/a EMAGINE THEATRE,<br><br>          Plaintiff,<br><br>v.<br><br>GRETCHEN E. WHITMER, ROBERT GORDON, and DANA NESSEL,<br><br>          Defendants. | Civil No.<br><br>HON.<br><br><br>**JURY TRIAL DEMANDED** |
| BUTZEL LONG, P.C.<br>Daniel J. McCarthy (P59457)<br>Joseph E. Richotte (P70902)<br>150 West Jefferson Avenue, Suite 100<br>Detroit, Michigan 48226<br>(313) 225-7000<br>mccarthyd@butzel.com<br>richotte@butzel.com<br>*Counsel for Plaintiffs* | |

## COMPLAINT

Plaintiff CH Royal Oak, LLC, doing business as Emagine Theatre ("**Emagine**"), alleges:

### INTRODUCTION

1.     For months, Michiganders were told it was too dangerous to leave their homes; every errand put them at an unacceptable risk of contracting a deadly virus. Those who turned out to protest the lockdown orders were accused of endangering lives.

2. That changed after the nation watched a police officer kneel on the neck of a man until he stopped breathing. Overnight, the nation erupted in protest against police misconduct, racism, and inequality. Peaceful protests, violent riots, looting, and vandalism have swept through most major cities for weeks. Politicians in Michigan who blasted earlier protests as dangerous vectors for the virus championed these protests and joined them, dismissively minimizing concerns that the protests would spread the virus as long as protestors kept their social distance and wore masks.

3. Emagine wants to support the movement for equality. Emagine announced that it would host a film festival in support of the protests, selecting movies to promote racial equality in honor of Juneteenth, a holiday celebrating the emancipation of the last remaining slaves in the Confederacy. All net ticket proceeds would be donated to the United Negro College Fund ("**UNCF**"), a philanthropic organization that funds scholarships for black students and general scholarship funds for 37 private historically black colleges and universities. In preparation for this cinema protest, Emagine took steps to implement a 26-page plan to safely open the theatre to moviegoers. It trained employees, instituted a social distancing plan, physically removed seats to promote social distancing, adopted enhanced sanitation protocols, and procured personal protection equipment ("**PPE**"), among other things.

4. On the eve of the protest, the Michigan Department of Attorney General served Emagine's owner, Paul Glantz, with a warning letter, informing him that it would file criminal charges if Emagine proceeded with the Juneteenth film festival "in the interest of public health." Exhibit 1, Grossi Ltr. (Jun. 18, 2020). This is an unconstitutional prior restraint on speech, pure and simple.

5. Street protests are okay, but cinema protests are not. The Governor can protest, but business leaders cannot. Restaurants, public swimming pools, and barbershops are open, but a safety-conscious proprietor who has adopted more stringent standards than required for other businesses to reopen must remain closed—purportedly

because of "science" and "facts and data" that the Governor still has not shared after three months of shuttering businesses like Emagine.

6. Instead of risking criminal prosecution, Emagine has postponed the Juneteenth film festival and filed this lawsuit to vindicate its civil rights.

## PARTIES

7. Plaintiff Emagine operates a motion picture theatre in Royal Oak, Michigan. It enjoys the honor and distinction of being named "Best Movie Theatre" for several years running by *The Detroit News*, the *Detroit Free Press*, and WDIV television. Emagine is proud to be a Midwestern company with a special passion for giving back to the communities in which it operates.

8. Defendant Gretchen E. Whitmer is the Governor of the State of Michigan. Emagine sues the Governor in her official capacity only.

9. Defendant Robert Gordon is the Director of the Michigan Department of Health and Human Services ("**MDHHS**"). Emagine sues the Director in his official capacity only.

10. Defendant Dana Nessel is the Attorney General for the State of Michigan. Emagine sues the Attorney General in her official capacity only.

## JURISDICTION

11. This action arises under 42 U.S.C. § 1983. Emagine challenges Governor Whitmer's Executive Order 2020-110 ("**EO-110**"), Director Gordon's Emergency Order dated May 18, 2020, MDHHS's Emergency Rules dated April 2, 2020 (collectively, the "**Lockdown Orders**"), and all future iterations of such orders and rules that close or limit the operation of motion picture theatres. Emagine alleges that the Lockdown Orders violate the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Court therefore has federal-question jurisdiction under Article III of the U.S. Constitution and 28 U.S.C. § 1331.

12. Emagine seeks declaratory relief and a preliminary and permanent injunction against the enforcement of the Lockdown Orders and against the issuance of similarly crafted orders and rules issued in the future. Accordingly, it brings this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the All Writs Act, 28 U.S.C. § 1651.

## VENUE

13. The Governor is a resident of, and her principal office is located in, Lansing, Michigan.

14. The Director's principal office is located in Lansing, Michigan.

15. The Attorney General's principal office is located in Lansing, Michigan.

16. The city of Lansing is the seat of government for the State of Michigan. Michigan Const. art. III, § 1 (1963). It is located within Ingham County, which is within the territorial jurisdiction of the Western District of Michigan. 28 U.S.C. § 102(b)(1). This Court is therefore a proper venue for this action under 28 U.S.C. § 1391(b)(1)–(2).

## COMMON ALLEGATIONS

*Executive Orders*

17. On March 11, 2020, the Governor issued Executive Order 2020-04, which declared a "state of emergency" based upon two presumptive diagnoses of coronavirus disease ("**COVID-19**"), a respiratory illness caused by a virus named the severe acute respiratory syndrome coronavirus two ("**SARS-CoV-2**" or the "**coronavirus**").

18. On March 21, 2020, acting under color of state law after declaring an emergency, the Governor issued Executive Order 2020-20 ("**EO-20**"), which closed Emagine Theatre and scores of other businesses across the state. On March 23, 2020, the Governor issued Executive Order 2020-21 ("**EO-21**"), which closed every other "noncritical" business in the state. The Governor has repeatedly extended these orders, maintaining a distinction between places of public accommodation and entertainment on

the one hand and all other businesses on the other.  See Exec. Orders 2020-42, 2020-43, 2020-59, 2020-69, 2020-70, 2020-77, 2020-92, 2020-96, 2020-100, 2020-110, and 220-115.

19.   On June 1, 2020, the Governor issued EO-110, which dispensed with this dual-order approach and incorporated the closure of theatres into a broader, unified order regulating all commerce throughout Michigan by region.  EO-110 has no sunset date.

20.   On June 5, 2020, the Governor issued Executive Order 2020-115 ("**EO-115**"), which allowed theatres to open in two regions located in northern Michigan.  Theatres reopening under EO-115 must facilitate social distancing and limit capacity in any screening room to 250 patrons or 25% of the room's maximum capacity, whichever is smaller.  Theatres in all other parts of the state remain closed under EO-110.  Emagine does not operate a motion picture theatre in the two regions where theatres are allowed to reopen.  It therefore remains closed under EO-110.

21.   Each executive order has specified that a willful violation is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.

22.   The Governor has repeatedly extended the state of emergency.  She most recently extended it on June 18, 2020, through at least July 16, 2020.  Exec. Order 2020-127(3).  Each executive order declaring an emergency, and each executive order cited in this Complaint, provides that a state of emergency will continue until "the threats posed by COVID-19 to life and the public health, safety, and welfare of this state have been neutralized."  When used in connection with biology and medicine, the word "neutralized" means "to render a virus non-infective."[1]  Stated differently, the Governor intends to keep Michigan in an indefinite state of emergency until a vaccine is available.  Even if one becomes available, the Governor could theoretically continue the emergency if she finds that the vaccine is inadequate or if she determines that an insufficient portion of

---

[1]   "Neutralize, v.," Sense 6a, Biology & Medicine.  Oxford English Dictionary (3d ed., Jun. 2020), www.oed.com/view/Entry/126463.

the population has elected to take it.

*Action by MDHHS*

23. On April 2, 2020, Director Gordon issued an emergency order under the Michigan Public Health Code ("**EHO-1**"), which required every person in Michigan to comply with EO-20 and EO-21, and authorized police and prosecutors to enforce those executive orders through EHO-1. https://perma.cc/K6ZH-HS6N. EHO-1 also applied to EO-42, EO-43, and EO-59. A violation of an MDHHS order is a misdemeanor punishable by imprisonment for up to six months and a fine of $200, or both. Mich. Comp. Laws § 333.2261. Thus, Director Gordon effectively doubled the period of incarceration authorized under the Governor's executive orders.

24. At the same time, Director Gordon issued an Emergency Rule establishing a $1,000 civil penalty for violations of EHO-1 ("**ER-1**"). https://perma.cc/8W5C-E98N.

25. On May 18, 2020, Director Gordon rescinded EHO-1 and issued a new emergency order under the Michigan Public Health Code ("**EHO-2**"). Mich. Comp. Laws § 333.2253(1). Relevant to Emagine's claims, EHO-2 applies to EO-69. Although the Governor has since rescinded EO-69, Director Gordon has not rescinded EHO-2.

26. In addition, although it rescinded EHO-1, EHO-2 specifically provides that "[a]ny references to [EHO-1] now refer to [EHO-2]." EHO-2(8). It therefore appears that ER-1 remains in effect and applies to violations of EHO-2.

27. So, since April 2, 2020, any person who violates the Governor's executive orders (and thereby automatically violated EHO-1 or EHO-2 and ER-1) can now be imprisoned for up to six months, assessed a penal fine of up to $500, and assessed a civil fine of up to $1,000.

*Public Protests*

28. On May 25, 2020, George Floyd died in police custody after one of the arresting officers kneeled on his neck so hard that he stopped breathing. Floyd's death has prompted peaceful protests, violent riots, looting, and vandalism nationwide demanding racial equality.

29. Although Michigan has not been immune to violent riots, looting, and vandalism, peaceful protests have occurred throughout Michigan, including in Detroit, Highland Park, Pontiac, Flint, Saginaw, Ann Arbor, Lansing, Kalamazoo, Grand Rapids, Traverse City, Sault St. Marie, Marquette, and Houghton.

30. In April 2020, the Governor warned that those protesting her executive orders could spread the coronavirus, cause a spike in COVID-19 cases, and cause her to extend the lockdown:

> "So these protests, they ***do*** undermine the effort. And it's very clearly a political statement that is playing out where people are coming together from across the state, they're congregating, they are not wearing masks. They are not staying six feet apart. And then they go back home into communities and the risk of perpetuating the spread of COVID-19 is real. ***We've seen it happen***. And that's why, while I respect people's right to dissent, they need to do it in a way that's responsible and does not put others at risk."

Whitmer, *Gov. Gretchen Whitmer addresses Michigan's COVID response and reacts to armed protestors*, 0:58–1:30, The View (May 13, 2020), https://www.youtube.com/watch?v=XXrGByrNTII (emphases in original). Yet, as time passed, and presumably because the "curve" had been "flattened" in early April, Exhibit 2, Anderson Econ. Rpt. (Apr. 13, 2020), mass gatherings for protests were no longer seen or viewed as dangerous.

31. For example, on June 4, 2020, the Governor participated in a civil rights march in Highland Park in support of the George Floyd protest. Under EO-110, which was in force on June 4, 2020, any person who left their home had to follow social-distancing

measures recommended by the Centers for Disease Control and Prevention ("**CDC**"). Among other things, this included maintaining a distance of at least six feet from other people. EO-110(4)(a). The Governor did not maintain a distance of six feet from others, but her office reported that such activity was exempt as constitutionally-protected activity under EO-110.

32. Protests in Michigan and across the nation have continued daily or near daily over the past several weeks. Inspired by the protests and news coverage of them, Emagine wished to honor Juneteenth, which celebrates the emancipation of the last remaining slaves in the Confederacy by Union forces at Galveston, Texas.

33. Emagine decided to voice support for the protestors' stated goal of racial equality, both to the public and to elected officials, through protest cinema. On June 15, 2020, Emagine announced that it would host a Juneteenth film festival of movies that promote racial equality, including classics like *Imitation of Life*, *Guess Who's Coming to Dinner?*, and *The Defiant Ones*, and modern films on race like *Do the Right Thing*, *American History X*, and *I Am Not Your Negro*. Emagine announced that all net ticket proceeds would be donated to the United Negro College Fund, a philanthropic organization that funds scholarships for black students and general scholarship funds for 37 private historically black colleges and universities.

34. In preparation for this protest-by-cinema, Emagine Theatre took steps to implement a 26-page plan to safely open the theatre to moviegoers, which had been prepared by Glantz and others through the Michigan chapter of the National Association of Theatre Owners ("**NATO**"). Exhibit 3, NATO Plan (May 21, 2020). Emagine trained employees, instituted a social distancing plan, physically removed seats to promote social distancing, adopted enhanced sanitation protocols, and PPE, among other things.

35. Notably, NATO had sent a copy of this plan to the Governor when she announced her plan to reopen the economy in phases. Like many other industries that tried to be proactive and prove to the Governor that they could safely operate their

businesses, the Governor never responded to NATO's proposal.

### *Action by the Attorney General*

36. Instead of contacting Glantz and Emagine Theatre, the Michigan Department of Attorney General pressured Royal Oak police to stop the film protest from going forward.  Commendably, Royal Oak police declined to do so, sensitive to the First Amendment interests in play.

37. Undeterred, the Department of Attorney General served Glantz with a warning letter ("**Warning Letter**"), informing him that it would file criminal charges if Emagine proceeded with the Juneteenth film festival, "in the interest of public health." Exhibit 1.  This was an unconstitutional prior restraint on speech.

38. Instead of risking criminal prosecution, Emagine postponed the Juneteenth film festival and filed this lawsuit to vindicate their civil rights.

### *Coronavirus Data*

39. The coronavirus does not warrant a shutdown of all businesses.

40. Although reportedly the coronavirus is highly contagious, it does not invariably result in COVID-19.  The CDC estimates that 35% of those contract the virus are asymptomatic—*i.e.*, they show no signs of infection.  CDC, COVID-19 Pandemic Planning Scenarios, Table 1 (May 20, 2020), https://perma.cc/2JUY-M3XG.  About 80% of cases are mild to moderate, and do not require hospitalization.

41. For those hospitalized, 75% were over 50 years old.  Garg, et al., Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019, March 1–30, 2020, p.1 (Apr. 17, 2020), https://perma.cc/3CBT-WXWB.  Nearly 90% of hospitalized patients have an underlying condition, the most common being high blood pressure, obesity, chronic lung disease, diabetes, and heart disease.  *Ibid.*

42. In Michigan, as of June 19, 2020, 0.6% of Michigan residents have contracted the coronavirus, and just 0.06% have died from COVID-19. More than one-third of those deaths occurred in nursing homes. The elderly—who make up less than 20% of the state's population—are most at risk of dying:



43. Based purely on the number of confirmed deaths divided against the number of confirmed cases, Michigan's fatality rate is 9.6% as of June 19, 2020. In all likelihood, however, the fatality rate is far lower. Antibody studies conducted in New York and California suggest that millions more have been infected with the coronavirus than previously known. A study performed by Stanford University School of Medicine estimates a fatality rate of 0.17%—*i.e.*, a survival rate of 99.83%. Bendavid, et al., COVID-19 Antibody Seroprevalence in Santa Clara County, California, p. 7 (Apr. 27, 2020), https://perma.cc/46VX-HJ2G. A similar study in New York estimates a fatality rate of 0.5%—*i.e.*, a survival rate of 99.5%. There is no reason to believe that Michigan is exempt from this good news. As more Michiganders are tested, increases in positive tests will likely yield a higher survival rate.

44. Equally important to determining an accurate survival rate is properly counting COVID-19 deaths. Michigan's method for counting "confirmed" deaths artificially inflates the death count.

45. The World Health Organization ("**WHO**") has created two emergency COVID-19 death codes: (1) "U07.1, COVID-19, virus identified"; and (2) "U07.2,

COVID-19, virus not identified," which is used when laboratory confirmation is inconclusive or not available.  WHO guidelines allow both to be used to code COVID-19 as a cause of death.  https://perma.cc/SP9D-XXU2.  Stated differently, even when the coronavirus *is not identified* in the person, it can still be listed as a COVID-19 death.

46. The WHO has also rolled out an ICD-11 code for living patients: (1) RA01.0, which is used for a laboratory-confirmed case of COVID-19; and (2) RA01.1, which is used for suspected or probable cases.  https://perma.cc/SP9D-XXU2.

47. The CDC relies on three death codes: the U07.1 code and two codes for pneumonia, J12.0 and J18.9.  While this appears more reasonable than the WHO guidance, it's not.  The CDC instructs physicians to use the U07.1 code when the death was *presumed* to have been caused by COVID-19.  CDC, Provisional Death Counts for COVID-19, Understanding the Numbers, How It Works (May 8, 2020), https://perma.cc/E7CR-CBLY.  Physicians have been instructed to report *assumed* deaths as the *actual* cause of death on death certificates: "It is important to emphasize that Coronavirus Disease 2019 or COVID-19 should be reported on a death certificate for all decedents where the disease caused *or is assumed to have caused or contributed* to death." Schwartz, Guidance for Certifying COVID-19 Deaths, National Vital Statistics System (Mar. 4, 2020), https://perma.cc/YA35-9J4N.  In other words, the CDC counts both true COVID-19 cases and speculative guesses of COVID-19 the same.  This still artificially increases the number of COVID-19 deaths.

48. Michigan counts all deaths coded on a death certificate under U07.1 as COVID-19 deaths.  But it also looks beyond death certificates and counts as COVID-19 deaths where a person was diagnostically coded RA01.0 if they die of natural causes within 30 days after the diagnosis.  See Mich. Coronavirus Data, Learn More: *How does MDHHS classify confirmed and probable deaths?*, https://bit.ly/MichCoronavirus.  A person can be counted as a "confirmed" COVID-19 death *even when an attending physician or medical examiner concluded that the person died naturally of something other*

*than COVID-19*.

49. For example, a patient with heart disease can be diagnosed as a having contracted coronavirus, die of a heart attack because of the heart disease, ***and the physician could code the cause of death as heart disease***, but the State would still list the patient as a "confirmed" COVID-19 death.

50. Take another example: the same patient, instead of dying of a heart attack in the hospital, recovers and is discharged, but dies at home from another heart attack two weeks later. The State would still count this patient as a "confirmed" COVID-19 death.

51. This method of counting "confirmed" deaths distorts mortality rates and misleads the public about the threat that the coronavirus actually poses. Simply put, the State appears to be intentionally inflating COVID-19 death statistics to justify the asserted emergency.

***Coronavirus Response is Neither Narrowly Tailored Nor Reasonable***

52. Based on speculative modeling and distorted mortality rates, the Governor locked down the entire state. She put 10 million under *de facto* house arrest, shuttered the economy, caused more than 25% of the workforce to file for unemployment, and generated a $3.6 billion budget deficit instead of tailoring measures designed to protect the at-risk population.

53. Even when considering the inflated number of deaths caused by COVID-19, the number of deaths is not "unprecedented," as the Governor has routinely claimed. What is unprecedented is her response to it.

54. In 1918, in response to the Spanish Flu, Governor Albert Sleeper issued an order closing places of public amusement. Individual cities decided whether to close schools. Work continued. Governor Sleeper wisely balanced public health while preserving commerce. The current executive orders fail to do so, overreaching to such extent that the State's economy is spiraling toward a depression.

55. In the 1940s and the early 1950s, annual summer polio epidemics killed thousands of children before a vaccine was found. Even under such dire circumstances, governors of both parties, including Governor G. Mennen Williams, refrained from violating constitutional norms with excessive executive orders during those years.

56. In the late 1960s, the Hong Kong Flu swept across the globe killing more than 1 million people. The CDC estimated that 100,000 people died in the U.S. Michigan, like other States, was affected. Governor George Romney did not place residents under house arrest or shutdown the economy then, either.

57. Governor Whitmer's initial Executive Order was premised on the perceived need to "flatten the curve" so as to avoid overwhelming the State's hospitals and healthcare centers. She has repeatedly stated that decisions must be made on "facts and data." Objective data and reporting shows that the curve was flattened during the first week of April 2020. Exhibit 1. See also Beaumont Hosp. Chart:



58. Although the curve has been flattened, the Governor still prohibits theatres from reopening under the rubric of an indefinite "emergency."

59. The Governor has never identified any "facts and data" or scientific support for closing theatres, much less for keeping them closed indefinitely while allowing other businesses to reopen. Nor has she ever explained why NATO's 26-page plan, or the steps Emagine has taken and will take to protect patrons, does not adequately abate the risk of contagion.

60. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

61. Emagine incorporates all of the foregoing paragraphs into each of the following causes of action.

## COUNT I
## SUBSTANTIVE DUE PROCESS
## 42 U.S.C. § 1983

62. No State can deprive any person of life, liberty, or property, without due process of law.

63. The substantive component of the Due Process Clause prohibits government from taking action that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *United States* v. *Salerno*, 481 U.S. 739, 746 (1987) (cleaned up).

64. The Lockdown Orders and the Warning Letter interfered, and continue to interfere, with Emagine's First Amendment rights under the Speech Clause, the Petition Clause, and the Assembly Clause by suppressing speech, suppressing its right to petition the government, and suppressing its right to peaceably assemble.

65. The Lockdown Orders and Warning Letter also interfered, and continue to interfere, with Emagine's liberty and property interests under the Fourteenth Amendment to engage in commerce.

66. The Governor, the Director, and the Attorney General acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders and the Warning Letter.

67. As a direct and proximate cause of the failure to provide any pre- or post-deprivation process, Emagine suffered prejudice under threat of criminal and civil sanctions.

68. Emagine seeks a declaration that the Lockdown Orders and the Warning Letter violate the substantive component of the Due Process Clause, and an injunction against further infringements of its rights under this Clause as described in the Prayer for Relief.

## COUNT II
## PROCEDURAL DUE PROCESS
## 42 U.S.C. § 1983

69. No State can deprive any person of life, liberty, or property, without due process of law.

70. The procedural component of the Due Process Clause prohibits government from depriving Emagine of liberty and property interests without providing any process before or after the deprivations occurred.

71. To establish a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must show that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights.

72. Emagine had and has protected liberty and property interests, which Defendants infringed through the Lockdown Orders and the Warning Letter, to-wit: freedom of speech guaranteed by the Speech Clause, right to petition guaranteed by the

Petition Clause, the right to peaceably assemble with others to protest injustice under the Assembly Clause, and the right to engage in commerce under the Due Process Clause.

73. The Lockdown Orders and the Warning Letter deprived Emagine of these constitutionally protected interests without any procedural due process before issuing the Lockdown Orders. Nor do the Lockdown Orders or Warning Letter provide any mechanism for post-deprivation review.

74. The Governor, the Director, and the Attorney General acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders and Warning Letter.

75. As a direct and proximate cause of Defendants' failure to provide any pre- or post-deprivation process, Emagine has suffered and is suffering substantial losses of liberty and property under threat of criminal and civil sanctions. Emagine has lost and continues to lose about $170,000 per month after EBITA that the theatre is closed.

76. Emagine seeks a declaration that the Lockdown Orders and the Warning Letter violate the procedural component of the Due Process Clause, and an injunction against further infringements of its rights under this Clause as described in the Prayer for Relief.

## COUNT III
## EQUAL PROTECTION
## 42 U.S.C. § 1983

77. No State can deny to any person within its jurisdiction the equal protection of the laws.

78. The Lockdown Orders and Warning Letter deprive Emagine of the equal protection of the law because they allow some businesses to operate but not Emagine, even though Emagine is similarly situated to: (a) theatres allowed to operate in northern Michigan; and (b) other businesses allowed to reopen throughout the state.

79. Emagine could and can conduct business in full compliance with all of the rules imposed on businesses allowed to operate under the Lockdown Orders, or reasonably equivalent and equally safe measures tailored to the unique nature of its in-person operations. Thus, Defendants' actions are not narrowly tailored to achieve a compelling governmental interest.

80. Nor is there any reasonable basis to deprive Emagine of its liberty and property interests in performing services for willing customers when it can do so safely and in the same (or reasonably safe equivalent) manner as other businesses allowed to operate. Alternatively, Defendants' actions are not reasonably related to a legitimate governmental interest.

81. The Governor, the Director, and the Attorney General acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders and the Warning Letter.

82. Emagine seeks a declaration that the Lockdown Orders violate the Equal Protection Clause, and an injunction against further infringements of its rights under this Clause as described in the Prayer for Relief.

## COUNT IV
## DECLARATORY JUDGMENT
## VOID FOR VAGUENESS

83. There is an actual and present controversy between the parties.

84. Emagine contends that the Lockdown Orders are unconstitutionally vague under the void-for-vagueness doctrine under the U.S. and Michigan constitutions.

85. The void-for-vagueness doctrine requires penal laws to define criminal conduct with sufficient precision that ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary and discriminatory enforcement.

86. The Lockdown Orders purport to carry the force of law, and they are therefore subject to the void-for-vagueness doctrine.

87. EO-110 provides that "nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." EO-110(15).  Yet the Warning Letter has threatened Emagine and its owner, Paul Glantz, with criminal prosecution for engaging in activity protected by the First Amendment and Fourteenth Amendment.

88. EHO-1 did not, and EHO-2 and ER-1 do not, contain a similar clause excepting constitutionally protected activity from their reach.  Moreover, it is unclear whether EHO-2 and ER-1 remain in effect since the Governor rescinded the executive orders cited in EHO-2.

89. On information and belief, Defendants deny these contentions.

90. Emagine seeks a judicial declaration that EO-110 is void for vagueness and that EHO-2 and ER-1 are no longer in effect (or if they are, that constitutionally protected activity is exempt from their reach), and an injunction against enforcement or adoption of these and similar orders and rules in the future as described in the Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Emagine respectfully asks the Court to grant the following relief:

1. A declaratory judgment that the Lockdown Orders violate Emagine's constitutional rights as set forth in this Complaint and/or are void for vagueness;

2. Enjoin Defendants from enforcing the Lockdown Orders and from issuing any future orders or rules similar to the invalid ones described in this action;

3. Award Emagine its reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 and any other applicable law; and

4. Any other such further relief to which Emagine may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

**JURY DEMAND**

Under the Seventh Amendment to the U.S Constitution and Rule 38(b) of the Federal Rules of Civil Procedure, Emagine demands trial by jury on all issues so triable.

Dated: June 22, 2020

Respectfully submitted,

BUTZEL LONG, P.C.

*DANIEL J. MCCARTHY   P59457*

DANIEL J. MCCARTHY (P59457)
JOSEPH E. RICHOTTE (P70902)
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
(313) 225-7000
mccarthyd@butzel.com
richotte@butzel.com
*Counsel for Plaintiffs*

BH2938976.3