UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CH ROYAL OAK, LLC, ) | |
| Plaintiff, ) | |
| ) | No. 1:20-cv-570 |
| -v- ) | |
| ) | Honorable Paul L. Maloney |
| GRETCHEN WHITMER, et al., ) | |
| Defendants. ) | |
| ) | |

## OPINION

This matter is before the Court on Plaintiff's motion for a preliminary injunction (ECF No. 4). Plaintiff seeks to enjoin Defendants from enforcing Michigan Executive Order ("EO") 2020-110, and instead allow Plaintiff to hold a film festival honoring the Juneteenth holiday. The Court heard oral argument on the motion on July 8, 2020. For the reasons to be stated, the Court will deny the motion.

### I.

This case exists because of the coronavirus pandemic, which needs no introduction. To contain the virus, Governor Gretchen Whitmer has issued over 120 executive orders. As of the time of writing, one of the operative Orders is EO 2020-110, titled "Temporary restrictions on certain events, gatherings, and businesses" (*see* ECF No. 9-12). That order requires "[i]ndoor theaters, cinemas, and performance venues" to remain closed "to ingress, egress, use, and occupancy by members of the public." (*Id.* at ¶ 12(a).) Paragraph 15 of that Order states, in relevant part: "nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." (*Id.*

at ¶ 15). Paragraph 19 of that Order makes clear that a willful violation of the Order is a misdemeanor (*Id.* at ¶ 19).

Executive Order 2020-115, titled the same, is also presently in effect (*See* ECF No. 9-13). This Order repeals EO 2020-110 for the entire upper peninsula and parts of the lower peninsula (*Id.* at ¶ 3). Thus, movie theaters and cinemas are permitted to open in those parts of the state, subject to certain safety requirements.

CH Royal Oak LLC, d/b/a Emagine Royal Oak ("Emagine"), owns and operates the Emagine movie theater in Royal Oak, Michigan. When Black Lives Matter protests started sweeping the nation around Memorial Day, Emagine sought to participate and honor the Juneteenth holiday with a "socially-distanced film festival." Emagine planned to participate in the protests by showing selected movies to promote racial equality during the week of June 19, 2020. On June 15, 2020, Emagine publicly announced that decision. In preparation for the event, Emagine implemented a 26-page safety plan, trained employees, physically removed seats to ensure social distancing, adopted new cleaning and sanitation protocols, and procured PPE (*see* ECF No. 4-3).

But on June 18, 2020, the Michigan Attorney General's office hand delivered a warning letter to Emagine's owner, Paul Glantz, threatening to file criminal charges if Emagine proceeded with the Juneteenth film festival (ECF No. 1-1). Emagine characterizes this as an "unconstitutional prior restraint on speech," and focuses its preliminary injunction motion on this alleged violation of its First Amendment rights. Emagine now seeks to enjoin Defendants from enforcing EO 2020-110 such that it can hold the Juneteenth film festival.

## II.

A trial court may issue a preliminary injunction under Federal Rule of Civil Procedure 65. A district court has discretion to grant or deny preliminary injunctions. *Planet Aid v. City of St. Johns, Michigan*, 782 F.3d 318, 323 (6th Cir. 2015). A court must consider each of four factors: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (quoting *Northeast Ohio Coalition for Homeless & Service Employees Int'l Union v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).

The four factors are not prerequisites that must be established at the outset but are interconnected considerations that must be balanced together. *Northeast Ohio Coalition*, 467 F.3d at 1009; *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (internal citation omitted); *see Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)).

The purpose of a preliminary injunction is to preserve the status quo. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 873 n. 13 (6th Cir. 2007) (quoting *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)). The Sixth Circuit has noted that "[a]lthough the four factors must be balanced, the demonstration of

some irreparable injury is a *sine qua non* for issuance of an injunction." *Patio Enclosures*, 39 F. App'x at 967 (citing *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).

### III.

First, the Court must consider whether Emagine has demonstrated a likelihood of success on the merits of its claim. But before the Court reaches the merits of the First Amendment claim, an important logical step is missing from Emagine's complaint. Woven throughout the complaint are allegations about violations of the First Amendment, and the entire preliminary injunction motion focuses on the First Amendment, but Emagine has not explicitly pleaded a First Amendment violation. Instead, Emagine alleges that Defendants have violated its rights to I) substantive due process, II) procedural due process, III) equal protection, and IV) that EO 2020-110 is void for vagueness.

The Supreme Court has stated that "[w]here a particular Amendment provides an explicit textual source of constitutional protection' against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Therefore, Count I (substantive due process) will be treated as if it pleaded a First Amendment claim.

Emagine's alleged irreparable injury is a violation of its First Amendment rights to participate in political speech via a "protest by cinema." It is well settled that movies can constitute speech, and accordingly, that movie theaters have First Amendment rights. *See, e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952). The First Amendment

4

protects the ability of individuals (and movie theaters) to speak without government control over the content of their messages. *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). Thus, government regulations that "suppress, disadvantage, or impose differential burdens upon speech because of its content" are subject to strict scrutiny. *Id.* This means, for example, that laws that burden only political speech "are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Russel v. Lundergan-Grimes*, 784 F.3d 1037, 1050 (6th Cir. 2015) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)). Strict scrutiny holds the government to the highest applicable standard of constitutional law, and the government carries the burden of justifying the restrictions and demonstrating that they are narrowly tailored. *Id.*

By contrast, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Turner*, 512 U.S. at 642. Under the intermediate scrutiny test, restrictions are valid if "they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Such restrictions are commonly known as time, place, or manner restrictions. *Id.*

It is not "not always a simple task" to determine whether a regulation is content based or content neutral. *Turner*, 512 U.S. at 642. The main inquiry is whether the government adopted the regulation in question because of agreement or disagreement with the message that the restricted speech conveys: "laws that by their terms distinguish favored speech from

disfavored speech on the basis of the ideas or views expressed are content based." *Id.* at 643. The "mere assertion" of a content-neutral purpose will not be enough to save a law which, on its face, discriminates based on content. *Id.* at 642-43.

That said, one type of government action is easily classified as presumptively invalid: a prior restraint. "A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001). "The essence of the prior restraint doctrine is censorship—a system in which bureaucrats screen material and remove from it parts that are considered too harmful or offensive for public consumption." *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 508 (6th Cir. 2001). Prior restraints are presumably invalid because they are "tantamount to censorship and thought control". *Id.* at 506.

An action or punishment that occurs after the speech is expressed, "like a punishment for disfavored speech, is not a prior restraint." *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019). Subsequent punishments are not subject to the higher protection that prior restraints receive; in fact, the First Amendment does not "prevent the subsequent punishment of [speech] as may be deemed contrary to the public welfare." *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 714 (1931); *see also Alexander v. United States*, 509 U.S. 544, 554 (1993) ("we have interpreted the First Amendment as providing greater protection from prior restraints than from subsequent punishments").

Not every governmental action that affects future expression is a prior restraint. Many government decisions will have some effect on First Amendment rights, but those actions are

subject to First Amendment scrutiny "only where it was conduct with a significant expressive element that drew the legal remedy in the first place." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). For example, in *Arcara*, an adult bookstore was being used to solicit prostitution. *Id.* at 699. That discovery led to a civil complaint seeking closure of the bookstore; the bookstore challenged the imposition of the closure remedy as an infringement of its First Amendment protected right to sell books. *Id.* at 700.

To evaluate the issue, the Supreme Court began by noting its holding in *United States v. O'Brien*, 391 U.S. 367 (1968), which held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 702-3 (quoting *O'Brien*, 391 U.S. at 376-77). The Court concluded that the *O'Brien* test was not implicated by the closure of the bookstore, explaining that

> we have not traditionally subjected every criminal and civil sanction imposed through legal process to "least restrictive means" scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in *O'Brien,* or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star*.[1] This case involves neither situation, and we conclude the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books.

*Id.* at 706-7.

---

[1] *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) (holding that a tax imposed on the sale of large quantities of newsprint and ink had the effect of singling out newspapers to shoulder its burden, in turn violating the newspapers' right to exercise their constitutionally protected freedom of the press rights).

7

The *Arcara* holding makes clear that a sanction imposed (or threatened) pursuant to a generally applicable law does not always trigger First Amendment scrutiny, even if the sanction has a burden on expression. The Supreme Court stated as much:

> [E]very civil and criminal remedy imposes some conceivable burden on First Amendment protected activities. One liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim. Similarly, a thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement, but we have explicitly rejected a prisoner's claim to a prison environment least restrictive of his desire to speak to outsiders.

*Id.* at 706 (internal citation omitted).

The Supreme Court reiterated this a few years later: "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). In short, a restriction is subject to First Amendment scrutiny only where (1) "it was conduct with a significant expressive element that drew the legal remedy in the first place," or (2) "where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." *Arcara*, 478 U.S. at 706-07.

Neither situation is present here. Emagine has argued that it was the Juneteenth film festival and its content that drew the threatened legal action in the first place. While this is logically true—had Emagine not planned the festival, they certainly would not have drawn the attention of the Michigan Attorney General's office—the larger picture must be considered. Emagine is closed due to the coronavirus pandemic and EO 2020-110, and it has been closed

8

since early March. Nothing in EO 2020-110 (or in any of its predecessor "Stay at Home" orders) is directed at limiting expressive activity. Instead, the order is directed at protecting the public health by keeping business that present a heightened risk of coronavirus infection from opening. It does not matter what kind of event Emagine had planned to throw: a Juneteenth film festival, a Fourth of July festival, or a regular re-opening. They would be subject to the same enforcement action from the Attorney General's office, because EO 2020-110 remains in force. So, while the Juneteenth film festival certainly has an expressive element, it is not the speech of the festival that Defendants sought to suppress. It is simply the congregation of large crowds, indoors, for hours at a time. Thus, the first scenario contemplated by *Arcara* is not present.

Nor is the second scenario: nothing in the EO singles out expressive activity or has the effect of singling out expressive activity. The EO explicitly states that it intends to protect constitutional rights as they exist in the pandemic. Outdoor protests are certainly allowed, as demonstrated by the Defendants' suggestion that Emagine hold its film festival outside and Governor Whitmer's participation in outdoor protests. EO 2020-110 does not have the "inevitable effect" of singling out expressive activity.

The Attorney General's letter to Emagine solidifies this conclusion. The letter refers only to the "interest of public health" and prohibits *any* re-opening of the theater. (ECF No. 1-1.) It makes no reference to the Juneteenth event. This shows that Emagine would be subject to penalty under EO 2020-110 regardless of what caused it to re-open, whether the re-opening was for a political event or otherwise. Moreover, the letter is more akin to a subsequent punishment than a prior restraint. The letter threatens prosecution only *after*

9

Emagine opens its doors and holds the event. Nothing in the letter requires Emagine to submit its film festival plans to the state for approval, nor does the letter mention any state review of the content of the film festival. For these reasons, the Court finds that the Defendants' actions and EO 2020-110 are not a prior restraint, so they are not presumptively invalid.

The Court must then determine whether EO 2020-110 is content-neutral. If so, the regulation is subject to immediate scrutiny; if not, it is subject to strict scrutiny. Put simply, nothing in EO 2020-110 relates to content, and again, nothing in the letter from the Michigan Attorney General's office relates to content. Had Emagine opened its doors for any purpose, it would have been threatened with the same enforcement action. There is no allowance for theaters to show certain movies but not others distinguished by their content. The order is a blanket order that keeps theaters and cinemas (and many other buildings and businesses) closed, regardless of what content they wish to disseminate. Therefore, the Court finds that the order is content neutral, and in turn, it is subject only to intermediate scrutiny.

A content-neutral regulation will be upheld under the intermediate scrutiny test "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997) (citing *O'Brien*, 391 U.S. at 377). Thus, EO 2020-110 will be held to be valid if it 1) serves a significant government interest, 2) is narrowly tailored to serve that significant governmental interest, and 3) leaves open ample alternatives for communication. *Clark v. Community for Creative Non-Violence*, 468 U.S.

288, 293. The parties do not dispute that EO 2020-110 serves the significant government interest of protecting the public health from the coronavirus pandemic.

Regarding the second requirement, the Supreme Court has repeatedly noted that "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000). Rather, the requirement of narrow tailoring is satisfied if the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989). The Court finds that this requirement is satisfied. The challenged portion of EO 2020-110 only requires movie theaters, cinemas, and indoor performance venues to keep their buildings closed to the public. It does not foreclose them from making political statements, making donations to support the causes they wish to support, showing movies outdoors, or devising other creative ways to show the movies they wish to show. Further, as discussed in more detail below, the coronavirus is thought to transmit from person to person via respiratory droplets, making large indoor gatherings, in the judgment of the Governor, particularly dangerous. Thus, the government interest of protecting the public from the coronavirus would be achieved less effectively if large groups were permitted to gather for sustained periods in movie theatres.

Regarding the final requirement, EO 2020-110 leaves open ample alternative methods of communication. Alternative methods of communication may be deemed adequate even if the speaker "is denied its best or favored means of communication." *Contributor v. City of Brentwood, Tennessee*, 726 F.3d 861, 865 (6th Cir. 2013). "The key

for purposes of the adequate-alternatives analysis is whether the proffered alternatives allow the speaker to reach its intended audience." *Id.* The government must simply offer "a list of potential alternative avenues of communication that are reasonable and made in good faith" to satisfy this requirement. *Id.* at 867. Defendants have done that here: they specifically note that Emagine may host its planned event outside in any outdoor theater, cinema, or performance venue. Or, Emagine could hold a different outdoor protest or fundraiser to voice its support for Black Lives Matter. While an outdoor event is not Emagine's preferred form of communication, it is certainly an available method of communication. Therefore, EO 2020-110 leaves open ample alternative methods of communications.

Accordingly, the Court finds that EO 2020-110 is a content-neutral and reasonable time, place, and manner restriction on Emagine's speech. As such, it is constitutional. But the Court's analysis would be incomplete without mention of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). Under *Jacobson*, the Court cannot second-guess the executive's power in a pandemic unless the executive promulgates a completely baseless rule. *See, e.g., League of Independent Fitness Facilities and Trainers v. Whitmer*, ___ F. App'x ___, 2020 WL 3648281, at *2 (6th Cir. June 24, 2020) ("the relevant standard merely requires 'rational speculation' that offers 'conceivable' support to the Governor's order").

This case presents a particularly simple *Jacobson* analysis: EO 2020-110 preserves the *Jacobson* framework in ¶ 15, which states that "nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution *under these emergency circumstances.*" As the Supreme Court and the Sixth Circuit Court have made clear, the protections guaranteed by the federal constitution are not absolute. Individual constitutional

rights are malleable under these emergency circumstances. *See id*; *Jacobson*, 197 U.S. at 29 (holding that the rights of individuals may be subject to restraint or reasonable regulations to protect the safety of the general public). The Court accordingly reads ¶ 15 of the EO to protect individuals' constitutional rights to the extent that they are protected under *Jacobson*. Under *Jacobson*, the individual rights of citizens and entities are subject to some restriction to preserve the public good, and Court must uphold the executive's decisions so long as there exists 'rational speculation' that offers 'conceivable' support to the Governor's order. *League of Independent Fitness Facilities and Trainers v. Whitmer*, 2020 WL 3648281, at *2.

It takes only a moment of rational speculation to discover conceivable support for the continued closure of indoor movie theaters. The Center for Disease Control ("CDC") advises that as gatherings grow larger, so too does the risk each attendee faces of becoming infected with COVID-19. *See* CDC, *Considerations for Events and Gatherings*, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html (last accessed July 15, 2020). The longer the interaction lasts, the higher these risks are. *Id*. The CDC recommends increasing circulation of outdoor air as much as possible to increase ventilation and reduce spread of airborne or aerosolized virus particles, and ultimately recommends prioritizing outdoor or online activities. *Id*. Movie theaters present large, sustained, indoor gatherings. This is the type of event the CDC cautions against holding. Therefore, there is support for EO 2020-110 under the *Jacobson* standard as presently interpreted by the Sixth Circuit in the context of the present pandemic.

In the face of this conclusion, Emagine argues that the Court must consider its 26-page safety plan, and "evaluate the facts as they exist on the ground." The Court disagrees:

13

in *League of Independent Fitness Facilities and Trainers v. Whitmer*, the Sixth Circuit ordered that gyms must remain closed under EO 2020-110, even though they would have been subject to the safety and mitigation requirements outlined in EO 2020-114 when they opened. *League of Independent Fitness Facilities and Trainers v. Whitmer*, ___ F. App'x ___, 2020 WL 3648281, at *2. The same applies here: the safety and mitigation tactics that Emagine proposes are irrelevant to the *Jacobson* analysis. The Executive Order remains constitutional and enforceable.[2]

In sum: EO 2020-110 is not a prior restraint, nor is it a content-based restriction on speech, so strict scrutiny does not apply. Instead, intermediate scrutiny applies and the Order survives. This is underscored by the *Jacobson* framework, which allows the executive to infringe on the rights of some to protect the health of all. Therefore, Emagine has not shown a likelihood of success on the merits, and this factor weighs in Defendants' favor.

## C.

Next, the Court must evaluate whether Emagine is at risk of suffering irreparable harm. The loss of First Amendment rights, even for a short period of time, constitutes irreparable harm. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). However, having found that EO 2020-110 is not a violation of Emagine's First Amendment rights, the argument that Emagine is suffering irreparable harm is without merit. *See*

---

[2] Emagine does not challenge the Governor's authority under state law to issue Executive Orders related to the pandemic. However, that remains a live issue. *See In re Certified Questions from the United States District Court, Western District of Michigan, Southern Division*, ___ N.W.2d ___, 2020 WL 3571909 (Mem) (Mich. June 30, 2020). The Court recognizes that the enforceability of EO 2020-110 (and many other EOs) is subject to the decision of the Michigan Supreme Court in that case.

*Overstreet*, 305 F.3d at 578. There was no other evidence of irreparable harm presented to the Court, so this factor also weighs in Defendants' favor.

### D.

Given the absence of a likelihood of success on the merits and irreparable harm, the Court need not evaluate or balance the remaining factors. *See Patio Enclosures*, 39 F. App'x at 970.

### IV.

Each factor in the preliminary injunction analysis favors Defendants. Plaintiff has not shown a likelihood of success on the merits of its claims, nor has it shown irreparable harm. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for a preliminary injunction (ECF No. 4) is **DENIED**.

**IT IS SO ORDERED.**

Date:  July 16, 2020                                            /s/ Paul L. Maloney
                                                                Paul L. Maloney
                                                                United States District Judge